UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 03-20487-CIV-SEITZ/BANDSTRA

NATIONAL COMMUNICATION LIMITED,
INC. d/b/a, NATCOM MARKETING,

    Plaintiff,

v.

REEBOK INTERNATIONAL LTD.,

    Defendant.
_____/



# DEFENDANT REEBOK INTERNATIONAL LTD.'S
# MOTION FOR SUMMARY JUDGMENT

Defendant Reebok International Ltd. ("Reebok"), pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, moves for the entry of summary judgment in its favor, and against Plaintiff, with respect to Plaintiff's single claim for breach of contract implied-in-law or, as it is commonly referred to, unjust enrichment. In order to avoid the duplicative filing of exhibits, the depositions, declarations, and other documents supporting and referred to in this Motion are attached to the Notice of Filing that Reebok filed on March 5, 2004 in connection with its opposition to Plaintiff's motion for partial summary judgment on liability.

Summary judgment should be entered in favor of Reebok because:

1.   There is absolutely no evidence in the record supporting Plaintiff's theory that Reebok "stole" Plaintiff's so-called idea of using the internationally known singer Shakira as a spokesperson and sponsoring her world tour. In fact, and as established by the undisputed evidence offered by Reebok, the decision to use Shakira as a spokesperson and to sponsor her tour was made **months before** Plaintiff ever mentioned Shakira's name to Reebok.

2. Because Plaintiff's single claim against Reebok is premised upon the conveyance of an idea, Plaintiff must establish that its idea was novel. Plaintiff, however, has not offered even a shred of evidence capable of supporting a finding that Plaintiff's alleged idea was novel.

## THE APPLICABLE STANDARD

A district court should award summary judgment to the moving party "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *United States Four Parcels of Real Property*, 941 F. 2d 1428, 1437 (11th Cir. 1991). The party moving for summary judgment bears the initial burden of informing the court of the basis of its motion, and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *See Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Where, as here, "the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim' in order to discharge this 'initial responsibility.' Instead, the moving party simply may 'show[ ] – that is, point[ ] out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" *Four Parcels of Real Property*, 941 F.2d at 1437-38 (quoting *Celotex Corp.*, 477 U.S. at 323 and 324) (emphasis and brackets in original) (internal citation omitted). "Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving

2

party will be unable to prove its case at trial." *See Id.* at 1438 (quoting *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting)).

This standard is easily satisfied here because not only is there an absence of record evidence supporting Plaintiff's case, but Reebok has offered undisputed, affirmative evidence establishing that Plaintiff will not be able to prove its case at trial.

## ARGUMENT

### I. *Plaintiff Cannot Advance In Its Motion For Partial Summary Judgment On Liability Theories That It Did Not Plead In The First Amended Complaint.*

As framed by the First Amended Complaint, Plaintiff's single claim against Reebok is premised entirely on the unsupportable theory that Plaintiff allegedly gave Reebok the idea of using Shakira as a spokesperson, and Reebok – without compensating Plaintiff – allegedly "stole" Plaintiff's idea and began using Shakira as a spokesperson and sponsored her world tour. This is best illustrated by paragraph 13 of the First Amended Complaint, where Plaintiff alleges:

> The discovery of Shakira's availability, the unique access to her agents, the successful effort to make contact with her, the analysis of her suitability, and the formulation of a recommendation that she be used conferred a valuable benefit on the defendant. Defendant, through its employees/agents, was aware of that benefit and voluntarily accepted and retained the benefit conferred by plaintiff.

In Plaintiff's motion for partial summary judgment on liability, however, Plaintiff attempted to expand the First Amended Complaint by adding new theories. Specifically, Plaintiff argued that in addition to allegedly giving Reebok the idea of using Shakira as a spokesperson, it also gave Reebok the idea of using

3

the slogans "Reebok Rave" and "Whenever, Wherever," "the idea of a celebrity tour and the idea of 'multi-brand cost efficiencies' in the marketing effort." **_Nowhere_** in the First Amended Complaint, however, did Plaintiff allege that it gave Reebok these ideas.

Of course, defendants in lawsuits cannot be made to defend against theories and operative facts that are advanced for the first time in papers filed by plaintiffs at the summary judgment stage. Indeed, in *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1091 (10th Cir. 1991), the Tenth Circuit refused to permit a plaintiff to essentially amend her complaint by introducing new theories in her response to a motion for summary judgment. Specifically, the Tenth Circuit held

> that the liberalized pleading rules [do not] permit plaintiffs to wait to the last minute to ascertain and revise the theories on which they intend to build their case. This practice, if permitted, would waste the parties' resources, as well as judicial resources, on discovery aimed at ultimately unavailing legal theories and would unfairly surprise defendants, requiring the court to grant further time for discovery or continuances.

*Id.* at 1091.

Thus, just as a plaintiff cannot use a response to a motion for summary judgment as an opportunity to amend its complaint, Plaintiff cannot use its motion for partial summary judgment as an opportunity to amend its First Amended Complaint and assert new theories. *See Fisher v. Metropolitan Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990) ("As the district court correctly noted, this claim was not raised in [plaintiff's] second amended complaint but, rather, was raised in his response to the defendants' motions for summary judgment and, as such, was not properly before the court"); *Welch v. Delta Air Lines, Inc.*, 978 F. Supp. 1133, 1138

4

(N.D.Ga. 1997) ("Plaintiff cannot change its theory of the case (in an effort to avoid summary judgment) *after* Defendant moves for summary judgment. The Magistrate Judge was correct in not allowing Plaintiff suddenly to change directions in a way that ultimately would have resulted in prejudice to Defendant") (parenthetical and emphasis in original); *Seale v. Miller*, 698 F. Supp. 883, 904 (N.D.Ga. 1988) ("the court is not inclined to overlook plaintiff's procedural violation given the obvious prejudice to the defendants of having to respond to new allegations at this [summary judgment] stage of the case"); *Marten v. Yellow Freight System, Inc.*, 993 F.Supp. 822, 829 (D. Kan. 1998) ("A claim not raised in the complaint and initially asserted in a response to a summary judgment motion is not properly before the court").

It is clear that the theories Plaintiff first advanced in its motion for summary judgment – but omitted from the First Amended Complaint – have no place in these proceedings and should be disregarded by the Court. Nevertheless, even if the Court were to consider these unpleaded theories, Reebok will establish that they are as frivolous and unsupportable as the theory pleaded in the First Amended Complaint, and that the entry of summary judgment in Reebok's favor is appropriate with respect to *all* of Plaintiff's theories.

## II. *The Entry Of Summary Judgment In Favor Of Reebok Is Warranted Because The Undisputed Evidence Establishes That Plaintiff's Claim Fails As A Matter Of Law.*

### A. *The Elements Of Unjust Enrichment*

As discussed above, Plaintiff has asserted a single state law claim against Reebok for breach of contract implied-in-law or, as it is commonly referred to, unjust

enrichment. As noted in this Court's Order dated June 23, 2003, in order to prevail on this claim Plaintiff must plead and prove each of the following elements: (1) Plaintiff conferred a benefit upon Reebok, who was aware of the benefit; (2) Reebok voluntarily accepted and retained the benefit; and (3) under the circumstances it would be inequitable for Reebok to retain the benefit without paying value to Plaintiff. The record evidence establishes that Plaintiff cannot satisfy any of these elements.

  B. *Plaintiff Did Not Confer A Benefit Upon Reebok, And Reebok Did Not Accept And Retain A Benefit Conferred By Plaintiff.*

In the First Amended Complaint, as "amended" by the motion for partial summary judgment, Plaintiff contends that it conferred a benefit upon Reebok by giving Reebok the idea of using Shakira as a spokesperson, the idea of using the slogans "Reebok Rave" and "Whenever, Wherever," "the idea of a celebrity tour and the idea of 'multi-brand cost efficiencies' in the marketing effort." Plaintiff also contends that Reebok accepted and retained these alleged benefits by "stealing" these ideas and not compensating Plaintiff. The undisputed evidence, however, establishes that Reebok did not obtain these ideas from Plaintiff, nor did it accept and retain any benefits allegedly conferred by Plaintiff.

### Shakira and The Tour

It is Plaintiff's theory that it conferred a benefit upon Reebok by giving Reebok the idea of using Shakira as a spokesperson and sponsoring a "celebrity tour." Plaintiff further theorizes that after it gave Reebok these ideas – and solely as a result of Plaintiff's ideas – Reebok contacted Shakira, negotiated with her, and

6

ultimately reached an agreement under which she became Reebok's spokesperson and Reebok sponsored her world tour. Put simply, Plaintiff claims that Reebok "stole" these ideas from Plaintiff, and never paid Plaintiff for these ideas. The undisputed evidence, however, establishes that Reebok and Shakira began negotiating for her services as a spokesperson, and for Reebok to be a sponsor of her tour, **months before** Plaintiff even mentioned Shakira's name to Reebok.

According to Plaintiff, the idea of using Shakira as a spokesperson was *first* disclosed to Reebok in a "marketing plan presented to [Reebok] by letter to Steve Hagen, dated April 17, 2002" (Motion for Partial Summary Judgment at ¶ 9; Plaintiff's Answers to Reebok's First Set of Interrogatories (Exhibit N), No. 22).[1] Thus, the entry of summary judgment in favor of Reebok is required if the undisputed evidence establishes that Reebok began its negotiations with Shakira *before* April 17, 2002, the date on which – according to Plaintiff – it first mentioned Shakira's name to Reebok. As shown below, the uncontroverted evidence

---

[1] There is some suggestion in the record that Plaintiff mentioned Shakira to Reebok during a conference call that was held on April 3, 2002. Plaintiff, however, should not be permitted to assert that the "disclosure" of Shakira occurred during the April 3 conference call because Lazaro Hernandez (Plaintiff's Marketing Director) and Robert Rodriguez (Plaintiff's President and Chief Executive Officer) cannot get their stories straight as to whether Shakira was mentioned during the call. Hernandez testified that Shakira was mentioned during the conference call on April 3, 2002, and that the call was the first time Plaintiff ever mentioned Shakira's name to Reebok. Hernandez also testified that when, during the conference call on April 3, it became clear that one of Reebok's representatives (Steve Hagen) did not know who Shakira was, it was necessary for Plaintiff's representatives to explain who she was (Deposition of Lazaro Hernandez (Exhibit A), pp. 123-24, 126-27). Hernandez and Rodriguez both participated in the April 3 conference call (*Id.*, p. 117). In his affidavit, Rodriguez states that in a conference call that occurred **after** April 3, he discussed Shakira with Hagen and Hagen had no idea who she was (Rodriguez Aff., ¶8). Thus, according to Rodriguez, the conference call during which Plaintiff first mentioned Shakira to Reebok was held sometime after April 3. In any event, whether Plaintiff first mentioned Shakira to Reebok on April 3 or April 17 is immaterial because, as shown below, the undisputed evidence establishes that Reebok's negotiations with Shakira began in January 2002, months before April 2002.

7

establishes that Reebok and Shakira began negotiating the relationship identified in the First Amended Complaint months *before* April 17, 2002.

In November 2001, Reebok began announcing and launching its "Sounds and Rhythm of Sport" marketing campaign (Deposition of Muktesh Pant (Exhibit F), pp. 6-7). Through that campaign, Reebok sought to combine the worlds of music and sport to promote itself and its products; in other words, Reebok was "creating the marriage of sport and music" by, among other things, pairing musicians and athletes (*Id.*, pp. 6-7, 17). In the early stages of the campaign, the musicians being used were predominately male and appealed mainly to markets in the United States (*Id.*, pp. 29, 49). As a result of this, Reebok was searching for a female musician who would appeal to markets outside of the United States (*Id.*, pp. 29-30, 42, 49). As a further result of this, numerous people approached Muktesh "Micky" Pant, Reebok's Chief Marketing Officer, and offered suggestions as to who Reebok should consider using in the campaign (*Id.*, p. 17).

One such person was Jay Margolis, Reebok's President and Chief Operating Officer, who, at some point prior to January 15, 2002, suggested to Pant that Reebok consider working with a female musician named Shakira (*Id.*, p. 17). According to Pant's undisputed deposition testimony, Margolis was aware of Shakira because his daughter listened to her music (*Id.*).

The undisputed record evidence establishes that Shakira was again discussed as a potential spokesperson for Reebok and its products during Reebok's regularly conducted Global Marketing Summit, which began on January 15, 2002 (Ex. F, pp. 5-6; Deposition of Jorge Dionne (Exhibit L), p. 44). The Global Marketing Summit

8

was an opportunity for Reebok to bring together its marketing executives from all over the world to discuss marketing strategies (Ex. F, pp. 5-6). One of those in attendance at the Global Marketing Summit was Jorge Dionne, a marketing director who was responsible for marketing in Latin America. Dionne made a Power Point presentation discussing Shakira, and concluded it by playing a video cassette of Shakira performing her hit song "Whenever, Wherever." (Ex. L, pp. 40-42; Dionne's Power Point presentation (Exhibit E); Deposition of Steve Hagen (Exhibit K), pp. 31-33). Dionne played the Shakira video to emphasize that someone such as Shakira needed to be added to Reebok's team and, hopefully, to generate a request that Reebok sign a musician such as Shakira (Ex. L, pp. 44-45).

Pant, like everyone else present at the Global Marketing meeting, was electrified by Shakira and her performance (Ex. F, pp. 7-8). As Pant's undisputed deposition testimony establishes, Pant took the podium after Dionne's presentation – saw the effect that Shakira and her performance had had on those present – and told Steve Stoute of the Arnell Group: "Steve, you got to get us a contract with Shakira" (Id., pp. 8-9).[2] Hearing this, Stoute then "got up and said" "'Micky is giving me the command and I'm going to do it'" (Id.). Thus, it is undisputed that Reebok's decision to pursue and enter into a relationship with Shakira was made in January 2002 – not after April 17, 2002 when Plaintiff presented its so-called marketing plan to Reebok. (Id., pp. 8-9, 16, 51-52).

---

[2] Steve Stoute, an executive with the Arnell Group, was "a very well-known music executive [ ] who had been consulting with [Reebok] on a variety of music stars" and "was [the] principal architect in being able to put the [Reebok-Shakira] partnership together and he knew Paul Shindler, John Mason and Freddy Daman (sic), the three people that represented Shakira" (Ex. F, pp. 8, 10).

9

As established by the undisputed evidence, the ensuing negotiations between Reebok and Shakira began almost immediately after the Global Marketing Summit. "[R]ight from January" Reebok and Shakira's representatives – John Mason (her attorney) and Freddy DeMann (her manager) – opened "ongoing conversations" in order to make Shakira part of Reebok's team (Ex. F, pp. 10-11) Pant even went so far as to speak with "Tommy Matola (sic), who is the chairman of Sony Music, to help [Reebok] to be able to get a contract done quickly" (*Id.*). As an e-mail from Pant indisputably establishes, by January 28, 2002 Reebok was in negotiations with Shakira (Ex. G) and, by April 4, 2002, DeMann, who was Shakira's manager, already had received a written proposal sent by Steve Stoute on behalf of Reebok (Ex. H).

In sum, this evidence indisputably establishes that Reebok was in the process of securing Shakira's services as its spokesperson, and becoming a sponsor of her world tour, ***months before*** Plaintiff ever mentioned her name to Reebok. In light of this evidence, it is simply impossible for Plaintiff to establish that it conferred upon Reebok the "benefits" of the use of Shakira and her tour, and that Reebok accepted and retained these benefits. Put simply, Plaintiff is attempting to take credit for something that Reebok developed months before April 17, 2002. Accordingly, summary judgment should be entered in favor of Reebok to the extent Plaintiff's claim relates to Shakira and her tour.

**"Whenever, Wherever"**

Although not alleged in the First Amended Complaint, Plaintiff also argues that it gave Reebok the benefit of Plaintiff's idea of using the slogan "Whenever,

Wherever," and that Reebok accepted and retained the benefit by actually using the slogan. Ostensibly, this contention is based on paragraph 9 of Hernandez's affidavit, where he states: "Subsequently (sic) to [Hernandez's conversations with Tim Mitchell in early 2002], Mitchell consulted with me on his desire to use the theme "Whenever, Wherever" – which was the title of a Shakira song composed by him – in connection with some promotional activity." This contention is fatally flawed, and summary judgment should be entered in favor of Reebok, for at least three reasons.

First, **none** of the materials submitted by Plaintiff and contained in the record indicate that Plaintiff ever suggested to Reebok that Reebok use the slogan "Whenever, Wherever." Hernandez states in his affidavit that he and Mitchell discussed Mitchell's "desire" to use the slogan in connection with "some promotional activity," but Hernandez **does not** state that he ever passed this idea on to Reebok. Indeed, at paragraphs 10 and 11 of his affidavit, Hernandez lists the ideas he allegedly "came up with" and "submitted to defendant by letter dated April 17, 2002," and none of those ideas is the use of the slogan "Whenever, Wherever." Hernandez's affidavit is consistent with the text of the April 17, 2002 letter, itself, which does not suggest the use of "Whenever, Wherever" or even contain the words "Whenever, Wherever" (First Amended Complaint, Ex. B). It is clear that Plaintiff could not have conferred the benefit of "Whenever, Wherever" upon Reebok – and Reebok could not have accepted and retained this benefit – because the record contains **no** evidence even suggesting that Plaintiff ever mentioned this idea to Reebok.

11

Second, "Whenever, Wherever" is the title of a song performed by Shakira (Ex. F, pp. 65-66; Declaration of Wendy Kula (Exhibit I), ¶3). "Whenever, Wherever" was Shakira's first hit, and is the song that thrust her into the limelight and the public's consciousness (Ex. F, p. 65; Ex. I, ¶¶3-4). When Reebok contacted Shakira and negotiated for her services as a spokesperson, and for Reebok to be a sponsor of her world tour, Reebok was also negotiating for the ability and right to be associated with, among other things, Shakira, her music, and her public persona (Ex. I, ¶5). More specifically, one of the things Reebok was negotiating with Shakira for was the ability and right to be associated with her songs, and especially her hit songs, including "Whenever, Wherever" (Ex. F, p. 65; Ex. I, ¶5). As discussed previously, the undisputed evidence establishes that Reebok contacted Shakira and began these negotiations *before* Plaintiff ever mentioned Shakira's name to Reebok. Accordingly, it is impossible for Plaintiff to have conferred upon Reebok the benefit of the idea of associating with Shakira's songs, and for Reebok to have accepted and retained that benefit.

Third, according to Hernandez's affidavit, the "desire" to use the slogan "Whenever, Wherever" was Tim Mitchell's, not Plaintiff's. Plaintiff, who complains about Reebok allegedly taking its ideas, appears to be taking Mitchell's idea and passing it off as its own. Any cause of action for the alleged acceptance and retention of Tim Mitchell's idea belongs to Mitchell, and is misplaced in a cause of action for unjust enrichment asserted by Plaintiff.

In sum, the undisputed evidence establishes that the idea of using the slogan "Whenever, Wherever" was not a benefit that Plaintiff conferred upon Reebok, and

12

was not a benefit that Reebok accepted and retained. Indeed, the undisputed evidence establishes that Reebok's negotiations with Shakira for the right to associate itself with "Whenever, Wherever" began before Plaintiff ever mentioned Shakira's name to Reebok. Accordingly, summary judgment should be entered in favor of Reebok to the extent Plaintiff's claim relates to the use of "Whenever, Wherever."

### "Reebok Rave"

Plaintiff theorizes, but does not allege in the First Amended Complaint, that it gave Reebok the benefit of Plaintiff's idea of using the slogan "Reebok Rave," and Reebok accepted and retained this benefit by using "Reebok Rave" as the name for a running shoe (Motion, p. 4, ¶16). The undisputed evidence establishes that this theory, like the others, is not simply unsupportable but is frivolous because the Reebok Rave DMX running shoe was released by Reebok in the first quarter of 2000, two years *before* Plaintiff allegedly suggested the idea to Reebok.

According to Plaintiff, the idea of using the slogan "Reebok Rave" was first mentioned to Reebok in a letter from Plaintiff dated April 17, 2002 (Ex. A, pp. 133, 136-39, 163; Hernandez Aff., ¶¶10, 11; First Amended Complaint, Ex. B; Motion, p.3, ¶9). The Reebok Rave DMX running shoe, however, was released in the first quarter (January – March) of 2000 – more than two years *before* Plaintiff allegedly gave Reebok the idea of using the slogan "Reebok Rave" (Declaration of Bill McInnis (Exhibit J), ¶¶2-4). Put simply, the idea of using the slogan "Reebok Rave" was not a benefit that Plaintiff conferred upon Reebok and, by giving a running shoe the name "Reebok Rave," Reebok did not accept and retain the alleged benefit of this so-

13

called idea. Accordingly, summary judgment should be entered in favor of Reebok to the extent Plaintiff's claim relates to the use of "Reebok Rave."

## Multi-Brand Cost Efficiencies

The final theory advanced in Plaintiff's motion, but not alleged in the First Amended Complaint, is that Plaintiff conferred upon Reebok the benefit of the idea of using multi-brand cost efficiencies in a marketing effort, and that Reebok accepted and retained this benefit by using multi-brand cost efficiencies in its campaign involving Shakira. Once again, the undisputed evidence establishes the fallacy of this theory.

In a letter from Plaintiff to Reebok dated February 21, 2002, Plaintiff stated: "Since maximizing your budget appears to be the top priority, our goal will be to help you extend your budget's real-dollar value by . . . creating multi-brand cost efficiencies" (Motion, Ex. A).[3] Plaintiff's sole proof for the proposition that Reebok used the idea/benefit allegedly conferred by this statement is an e-mail written by Wendy Kula of Reebok that is dated September 11, 2002. In her e-mail, Ms. Kula noted that some of the **advertising** and marketing surrounding Shakira might be "co-branded with **Sony and Pepsi**" (Motion, Ex. B). As Ms. Kula explains – an explanation that is not contradicted by anything in the record – her statement regarding co-branding had nothing to do with any idea Plaintiff may have suggested to Reebok.

---

[3] According to Hernandez, the letter of February 21, 2002 was a "capabilities letter" (Ex. A, pp. 98). Hernandez describes capabilities letters as form letters that Plaintiff maintains and uses, and Hernandez merely "create[s] the entries as far as who it's going to and the company" (Id., pp. 51-52).

Where multiple entities have a common interest or stake in the success of a particular subject, the co-branding of advertising and marketing regarding the subject is an elementary principle and widespread practice (Ex. I, ¶7). In situations where there are multiple stakeholders, the stakeholders are able to save money by pooling their resources and engaging in joint (co-branded) advertising and marketing, as opposed to each stakeholder paying for and underwriting their own advertising and marketing (*Id.*, ¶8). This principle was especially applicable in the case of Shakira (*Id.*).

Sony, which is one of the two entities referenced in Ms. Kula's e-mail, is Shakira's record label (*Id.*, ¶9). As such, Sony had a large interest in promoting Shakira and increasing her visibility in the marketplace (*Id.*). Pepsi is the second entity referenced in Ms. Kula's e-mail. Among other things, Shakira appeared in television commercials for Pepsi's products, and Pepsi was one of the sponsors of Shakira's tour (*Id.*, ¶10). Thus, Pepsi also had a large interest in promoting Shakira and increasing her visibility in the marketplace (*Id.*). Shakira was Reebok's spokesperson, and Reebok was one of the sponsors of Shakira's tour (*Id.*, ¶11). Accordingly, Reebok – like Pepsi and Sony – had a large interest in promoting Shakira and increasing her visibility in the marketplace (*Id.*).

Ms. Kula's e-mail noted that because Pepsi, Sony, and Reebok each had an interest in marketing and advertising Shakira, and each company had a direct interest in increasing the visibility and success of Shakira, it was a matter of common sense that the three companies could save money if they pooled their resources in promoting Shakira. Indeed, Plaintiff's President and Chief Executive

15

Officer admitted at his deposition that the idea of multi-brand cost efficiencies permits entities to save money by pooling their resources, and was something that he, like Ms. Kula (Ex. I, ¶7), studied in his undergraduate marketing classes (Ex. M, pp. 190-91). Plaintiff's attempt to assert ownership over this common sense principle is simply ludicrous.

Plaintiff's attempt in this regard becomes even more ludicrous when considered in light of the fact that Ms. Kula never spoke to any of Plaintiff's representatives, and she never saw Plaintiff's letter of February 21, 2002 (Ex. I, ¶13). Nor did anyone at Reebok suggest to Ms. Kula that co-branding might be appropriate with respect to Shakira (*Id.*). Thus, Ms. Kula's statement in her e-mail that co-branding with Pepsi and Sony might be appropriate was not the result of a direct communication between her and Plaintiff. Nor was it the result of a communication between Plaintiff and another Reebok representative, with the Reebok representative subsequently passing the "idea" along to Ms. Kula. Rather, Ms. Kula's statement was the result of her observation that Sony, Pepsi, and Reebok each had an interest in Shakira, and her common sense conclusion that the three companies could save money if they pooled their resources (*Id.*).

Accordingly, summary judgment should be entered in favor of Reebok to the extent Plaintiff's claim relates to the use of multi-brand cost efficiencies.

    C.    *Under The Circumstances, It Would Be Inequitable For Plaintiff To Prevail.*

The third element of a claim for unjust enrichment requires Plaintiff to prove that under the circumstances it would be inequitable for Reebok to retain the

16

alleged benefit supposedly conferred upon it without paying value to Plaintiff. The record evidence does not establish this. Instead, the record evidence establishes just the opposite: Under the circumstances it would be inequitable for Plaintiff to prevail.

As demonstrated above, Reebok did not obtain any of the ideas identified in Plaintiff's papers from Plaintiff. To the contrary, those "ideas" were the product of Reebok's own efforts and ingenuity, and were developed long before Plaintiff claims to have disclosed their "ideas" to Reebok. Plaintiff is, quite simply, trying to profit from ideas it did not give Reebok. Unjust enrichment expressly requires an equitable analysis of the underlying circumstances and, based on the circumstances at issue here, there would be no equity in permitting Plaintiff to prevail. In fact, permitting Plaintiff to recover would be inequitable.

### III. *The Entry Of Summary Judgment In Favor Of Reebok Is Also Warranted On The Independent Ground That Plaintiff Cannot Establish That Its Ideas Were Novel.*

Under Florida law, a cause of action based on the conveyance of an idea – such as the cause of action Plaintiff has asserted against Reebok – requires that the idea be novel. *See Garrido v. Burger King Corp.*, 558 So.2d 79, 84 (Fla. 3d DCA 1990) ("we adopt the novelty requirement in cases involving state law causes of action based on the conveyance of an idea."); *see also All Pro Sports Camp, Inc. v. Walt Disney Co.*, 727 So.2d 363, 367 (Fla. 5th DCA 1999) (noting that in *Garrido* the court adopted novelty as an element of state common law claims based on the conveyance of an idea). "Courts adopting this rule [of novelty] have grounded it on the principle that an idea does not constitute property unless it is novel, and thus

no recovery can be had for use of an 'unnovel' idea." *Garrido*, 558 So.2d at 84 (citations omitted). According to these courts,

> [t]he critical issue in [a claim involving the conveyance of an idea] turns on whether the idea suggested by the plaintiff was original or novel. An idea may be a property right. But, when one submits an idea to another, no promise to pay for its use may be implied, and no asserted agreement enforced, if the elements of novelty and originality are absent, since the property right in an idea is based upon these two elements.

*See Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2ds 1173, 1178 (2nd Cir. 1993) (quoting *Downey v. General Foods Corp.*, 31 N.Y. 2nd 56, 286 N.E. 2nd 257, 259 (1972)); *see also Garrido*, 558 So. 2d at 84 (quoting *Downey*) (same).

In neither its First Amended Complaint nor its own motion for partial summary judgment did Plaintiff mention, much less discuss, the requirement of novelty. Perhaps Plaintiff thought it would be best not to mention novelty since it is difficult to seriously argue that any of Plaintiff's ideas could be considered novel. The use of a celebrity or singer to market a company's products, or sponsoring a celebrity's tour, **cannot under any** stretch of the imagination be considered novel. Indeed, as Plaintiff implicitly concedes as a result of its reliance on Kula's e-mail dated September 11, 2002, as Pant testified at his deposition (p. 60), and as Kula states in her declaration (¶¶9-10), not even the idea of sponsoring Shakira, specifically, can be considered novel in light of the fact that Sony and Pepsi were also sponsoring her tour and she was endorsing Pepsi's products.

Summary judgment should be entered in favor of Reebok.

## CONCLUSION

In sum, summary judgment should be entered in favor of Reebok, and against Plaintiff, with respect to Plaintiff's single cause of action for unjust enrichment because it is undisputed that Reebok did not misappropriate any ideas from Plaintiff, but instead independently developed those ideas. Alternatively, summary judgment is appropriate on the additional and independent ground that Plaintiff has failed to offer even a shred of evidence that its ideas were novel.

Respectfully submitted,

HOLLAND & KNIGHT LLP
Attorneys for Reebok
701 Brickell Avenue
Suite 3000
Miami, Florida 33131
(305) 374-8500 (telephone)
(305) 789-7799 (facsimile)

By: _____
Peter Prieto
Florida Bar No. 501492
Scott D. Ponce
Florida Bar No. 0169528

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via hand delivery on this 23rd day of March 2004, on Xavier L. Suarez, 2600 Douglas Road, Suite 600, Coral Gables, Florida 33134.

By: /s/ Peter Prieto

# 1777890 v1